Good morning, Your Honors, and may it please the Court. Michael Fawaz, appearing on behalf of the Defendant Appellant, SigmaTron International. As set forth in our brief, there are three principal arguments on appeal today, any of which warrant reversal of the District Court's judgment. I'm going to stop you, because it seems to me that your brief is premised on a few of the facts that favors the Defendant and ignores the jury verdict. Our standard of review after a jury verdict, I don't have to, you know, explain that, whose favor we construe the facts at this stage, and you didn't cite Reeves v. Sanderson, the case that controls our review of Rule 50 motions, so maybe you can help me with that. Your Honor, it's true, the Court will construe the evidence and alight most favorable in support of the verdict at this stage. But even under that standard, the evidence submitted did not rise to the level of a retaliatory discharge. The District Court relied almost exclusively in denying the motion on the testimony of two individuals, Michael Murphy and Eduardo Trujillo, two former SigmaTron employees. But Plante was terminated for knowingly allowing employees she supervised to mix solders in violation of customer specifications. Mr. Murphy, who the District Court relied upon but didn't cite, stated, if someone knowingly allowed their employees to hand solder circuit boards not according to customer specifications, that would be a, quote, serious violation. By her own independent witness' testimony, what she did was a serious violation, and she was terminated for that violation. Now, as to Mr. Trujillo, Your Honor, I recognize- Had the company ever fired an employee for a solder mix-up? Your Honor, there is an evidence that that had happened in the past, and what Mr. Murphy said was, there used to be an old boss who didn't follow all the rules. Now, we disagree with that characterization, but it's important to note that in November 2007, Gregory Fairhead assumed additional responsibility as the Director of Operations. It is uncontested that he found there was some laxity in terms of compliance with company policies. He overhauled all that. He met with his managers, and Mr. Murphy actually testified. He was asked, when in the past somebody had mixed solders or done something improper and weren't fired, was that under Gregory Fairhead? No. And Mr. Murphy's time at Sigmatron overlapped with Gregory Fairhead's role as Director of Operations and before Greg Fairhead's role as Director of Operations. So he would have knowledge that things were indeed different, and Planoff was terminated 13 months after Mr. Fairhead assumed that role. Now, Your Honor, that evidence actually supports judgment as matter of law because it shows she was not retaliated against. She was terminated for cause, as her own witness says, for a serious violation. But focusing on the issue of—and for that reason, judgment of matter of law should be entered—but as to the issue of the damages, and I'm quoting here, it was hard, I was just depressed, I have always been used to working. That testimony is the entirety of the testimony regarding the non-economic impact on plaintiff. Are you—you're not taking into account the fact that Sigmatron put Grazia out of work for 16 months at the very height of the recession. Are you actually contending that a jury couldn't take that into account? Being wrongly terminated at a time when millions of people are out of work would be an incredibly stressful situation if it were wrongful. Can't a jury take that into account? But, Your Honor, they would be taking into account non-evidence. They would be guessing. Where is the evidence as to the non-economic impact on her? They believed her. But— They believed her. Juries believe all sorts of things, and they believed her. Fair enough. But believed what? It was two lines of testimony. That it was stressful. So she didn't become hysterical. And I'm not suggesting she needs to be hysterical. But the precedent of this Court makes very clear that simply stating I was depressed—take the Ividia matter cited in our brief. Mr. Ividia testified. This Court criticized the testimony as being 14 lines of text in response to a single question where a grown man was brought to tears and described feeling like the Sears Tower had collapsed on his head. This Court criticized that an award of $21,000 in compensatory damages remitted it to $10,500. But as Your Honor just said, they didn't question the sincerity of the plaintiff. The Court said, we believe that this brought a grown man to tears. But what's important in Ividia is he testified at trial years later about the present impact that that termination had on him. So years later. And the Court said, we sympathize. It was unfortunate. But $21,000 is too much. Here, sometimes there are more sympathetic judges and less sympathetic judges. Every case is taken on its facts. Fair enough, Your Honor. But the facts of this case. One of the requirements in this circuit is the comparison of the award in this case to other matters. When comparing to other matters, plaintiff has not brought forth a single case in which under similar facts, this type of compensatory damages award was upheld in a retaliatory discharge. All of the cases that we have been able to find and cite, none of them distinguished by the plaintiff, awarded far less. There have been cases in which racial epithets were tossed at a plaintiff. There were humiliations. There was degradation. And the Court allowed things, some such as $15,000 or less in compensatory damages. I recognize every plaintiff is on its own. But there are comparisons for a reason. And $50,000 for two lines of text in a four-day trial with nothing else. And in terms of Your Honor mentioning that she was unemployed, she was living with her sister before her termination. She continued living with her sister. She was caring for her nephew, and it was rent-free. There are cases from this Court in which Maybe she was saving up to move out and then couldn't. Who knows? Your Honor, you're assuming that, but that's not in the record. That's the issue I have with this award. It's one thing if she had testified to that. It's one thing if her sister with whom she lived with testified to her state of mind during that time, or any of her friends or colleagues, or if she shared something else. As you just said, I was having trouble finding a job. I was depressed. I had therapy. It's not in the record, and so we're left to assume. And the jury verdict can't stand based on an assumption. And I think that award of $50,000 in compensatory But the jury's verdict in the one count that found in Sigmatron's favor can stand, correct? No one has challenged that on appeal, Your Honor. You know, you suggest that the size of the damages indicates jury bias. But it sure doesn't sound like a biased jury finding in Sigmatron's favor in one of the two counts. A biased jury would have found against the defendant on both accounts, seems to me. The suggestion on bias, Your Honor, was limited, and it was asked to the issue of punitive damages. In closing arguments, and I know the court's position on this. I am well familiar. Juries can do what they want in that regard, but their verdicts must be based on evidence. In closing argument, plaintiff herself characterized her punitive damages for both claims as having a value of $200,000. The jury returned a verdict 25% higher on a single claim for retaliatory discharge. So that was one issue where I noted it seemed to be based on bias. It seemed to be perhaps some confusion where they awarded it for simply finding even though they found against the plaintiff on the sexual harassment claim. But more important than that, where's the reprehensibility? The award here is $300,000. It is the highest award permitted by statute. The district court, in writing its opinion, said, I concede this is not one of the more egregious cases, such as cases citing one where there was threats of physical violence against the plaintiff. If this case has a $300,000 value, then what does a case where an individual was subject to racial epithets, where an individual was threatened with violence as in some of this other case law. $300,000 for those cases and $300,000 for this case where she was simply terminated because the company believed in good faith. She was knowingly violating customer specifications. So are you contending that she didn't show that the reasons given by the employer for her termination was false? I absolutely contend that, Your Honor. It was not shown to be false. And that several people involved in the firing lied about it? Your Honor, that was – And after she reported her supervisor for harassing her, he told another employee to stay away from her because he would be throwing bombs at her? Your Honor, I'd like to respond to that one. The district court pointed out that a person fairly high up in the organization manufactured a paper trail to cover up the real reason for the termination. Your Honor, that was actually addressed in our reply brief. The quote-unquote false paper trail, Mr. Fair had typed up his notes of who he had communicated with and the reasons for the termination. Upon doing that, Mr. Trujillo at trial said, oh, I didn't say that to Mr. Fairhead. It was one witness saying I didn't say one thing and another witness saying something else. It's not as if documents were fabricated. All right. The jury believed that witness. I just – But, Your Honor, that's the problem. Again, you may not weigh credibility, and I respect that. But Mr. Trujillo denied talking to plaintiff when plaintiff herself said he was the one who told me my employee was violating company policy. He says I didn't do that. She says Mr. Silverman wasn't around when that happened, but Mr. Silverman found out. Mr. Silverman said Trujillo told me. Trujillo said I didn't talk to him. Trujillo then spoke with Fairhead and he says no one was present for that. That does not rise to the level of reprehensibility. It shows different versions of the facts. And the jury believed one version. Fair enough. You're making my arguments. But they believed a version, but does that version justify $250,000 in punitive damage? Maybe. Maybe. But a maybe when compared to other case law doesn't amount to justifying this $250,000. It's the highest award by statute. We're going to say a case where a plaintiff is threatened with violence is entitled to $300,000, and this case is entitled to $300,000? That's untenable when you consider the statutory scheme. Finally, Your Honors, in the last argument on appeal, there were three issues that warrant a new trial. First, there was a juror during voir dire who stated in no uncertain terms, I do not believe in firing. Is that what the juror said? That is his exact words, Your Honor. He is a general manager of a company for 23 years. In that time was in charge of hiring and firing. He had never authorized the firing of anybody, ever, except for substance abuse. Why didn't you get rid of him? We did, Your Honor. We challenged him for cause. All right. And the district court said no. He, the district judge said, well, he didn't really show that he did. So you take a preemptory when you have something like that. Well, actually, Your Honor, this court's precedent says quite the opposite. There is no obligation to take a preemptory. Not an obligation. You think about it and you do it. But, Your Honor, we were entitled to three preemptories, each side. They were used on other jurors. This court's precedent in the cases we cited, the Marshall matter and the Thompson matter, this court holds that it's the district court's obligation, if there is even an appearance of bias, to conduct a question and answer session to uncover how deep the bias is and then strike a juror for cause if need be. The district judge did nothing. You know, he never said, look, I can't be fair. What that juror said was, I believe in retraining people rather than firing them. I believe in retraining people. He never said, I can't be fair. He actually said not only that he believes in retraining people, that he believes people just leave on their own if they're not happy with their jobs. And when the district court said, have you ever approved a firing for something other than substance abuse that's performance related? In 23 years, the answer was no by a gentleman who does not believe in firing. This is an employment case, Your Honor. An employment case where a juror was impaneled. I don't know what impact he had on that jury pool, but I would imagine it would be significant when a general manager can stand before a jury pool and say, I don't believe in firing. Did you imagine that it was significant when you were choosing the jury, that it would be? Enough to raise an objection for cause. But not enough to use one of your preemptories. But again, not a requirement of this court. Forget requirements. But, Your Honor, shifting the burden from the district court's obligation to follow up with a juror to requiring a defendant to use a preemptory on a juror who appears biased. If you see someone who appears biased, you get rid of that person. And we did with three other individuals. Well. We used what was given to us. The final argument, Your Honor, is the exclusion of Mr. Hock. He was disclosed in the disclosures. He was listed. Plaintiff offered an affidavit at some point. You didn't have him available to testify. Your Honor, that was the reason. You never revealed the content of his testimony. That was the reason given. We did, Your Honor. It's document number 140 in the record showing everything. And the court found that he would be duplicative. And the district court abused its discretion in so finding. He relied on Mr. Murphy and Mr. Trujillo while recognized as former employees and using their testimony as sacrosanct while ignoring another former employee. That was hurtful to Sigma Tron. And I see I've entered my rebuttal time. Thank you. Ms. Korn. Good morning, Your Honors. May it please the Court, Katherine Korn appearing for the plaintiff's appellee, Maria Gracia. Turning first briefly to defendants' claims that the court below committed errors warning a new trial. All such claims are barred because defendants failed to raise them in its motion for new trial in the district court. We cite Datacon v. United States, which holds that this failure precludes review. In its reply brief, defendant attempts to limit Datacon, but there's nothing in the decision which suggests that the ruling is limited to the precise situation presented there. And it goes on to attempt to carve out an exception to Datacon by citing the Supreme Court case of Unifem Food Services v. Swift from 2006. And Unifem is not directly on point, but it includes powerful language which supports our view that this supposed trial errors have not been preserved for review. And this is a quote. No procedural principle is more familiar to the court than that a right may be forfeited by the failure to make timely assertion of the right before a tribunal having jurisdiction of it. And this is actually the Unifem court quoting an earlier decision from 1944 in Yackas v. United States. And once the court has questions about those supposed trial errors, we'll stand on our brief to present the manner in which the specific waivers, in addition to the exclusion from the new trial motion, occurred for each issue and to explain that each of them lacks merit in any event. The district court was correct in denying defendants' post-trial motion for judgment as a matter of law on liability. It properly viewed all of the evidence in the light most favorable to the plaintiff, the non-moving party. Unlike defendant, as Judge Rothner recognized the defendant attempts to ignore a lot of the evidence, the district court appreciated that the verdict of the jury is entitled to great deference and that all of the evidence needs to be taken into account. You know, the defendant asked an interesting question. How did Silverman find out about the so-called soldiering error? The defendant says it's your burden to explain this. Although I must say I am not aware of a legal rule requiring you to do so. I agree, Your Honor, that I don't think we have a burden to explain it, and I don't know precisely, but Mr. Silverman was the manufacturing manager. He could roam around the production floor freely, and so he could have seen something himself and decided to attribute it to Trujillo for whatever reason. He could have been the recipient of a report from somebody else whom he didn't want to involve. I don't know. I don't think it matters. You know, on the punitive damage issue, was the jury presented with evidence about the defendant's assets? Was the jury aware that this was a global business with significant assets? The jury did not have any numbers, but it did have the testimony of defendant's witnesses that they had plants all over the world, that they sold to all kinds of industries, including aerospace and appliances, and they had many major customers. So you're contending that all of that evidence came in through the defendants? Absolutely, yes. Yes, and moreover, the jury knew that Mr. Fairhead, who made the termination decision, was an executive vice president. He had great authority, and he is the brother of Sigmatron's CEO. So I think that the jury could take into account and use its common sense and render a verdict that would be sufficient to send a message, if you will. How many were on your jury, 6 or 12? Eight. Eight? Eight. Hmm. How does that evidence bear on the degree of reprehensibility of this firing? I think that it bears on the amount of punitive damages. The degree of reprehensibility evidence, I think, is what was discussed earlier. That's the main criteria, in addition to disproportionality, that we evaluate punitives awards. So you just made a point that because Fairhead was an executive and was, what did you say, the brother-in-law of the CEO, what difference does that make as far as the degree of reprehensibility? Well, the district court noted that he was a high-ranking executive, and I was just fleshing that out because the jury also knew these other facts. Right, and my question is, why does that make any difference in the degree of reprehensibility of this retaliatory discharge? I think that the facts upon which reprehensibility is based are the facts discussed in the district court's order, that there was a high-ranking executive who manufactured a false statement. I'm not seeing the logic behind it. I'm asking you to explain that rather than just restating it. Why does that make this more reprehensible? Because the person who made the decision was a high-ranking official. I think that one of the goals of punitive damages is deterrence, and when you have a high-ranking individual involved in the violation, in the civil rights violation, that a larger amount is necessary to deter future conduct. Was that argument made to the jury? No, I don't believe it was. The jury can use its common sense, however, and its experience in life. I'm concerned about the size of the non-economic damages award in this case because it is so disproportionate to others that we have seen in our case law, and I recognize that there's no fixed rule here, but it is the role of this court to sort of police the boundaries of what's appropriate in non-economic damages in these retaliatory discharge cases, and this seems to be significantly out of proportion based on the absence of evidence of her non-economic loss. The evidence consists of the one statement that Mr. Follis referenced. And as Professor pointed out, that she was out of work for 16 months. Right, and she got a back pay equitable award. That wasn't part of the jury's equation. But I don't think that the back pay is fully compensatory for the emotional impact of being out of work in the height of the recession. You don't know what's going to happen next. You're sending out resumes. You're not getting any responses. We'd usually expect some development of that in the record through the plaintiff herself in explaining the impact, the non-economic emotional impact, that she's requesting compensation for, and there was no development of that whatsoever in this trial. And we would rely on this court's decision in, and I hope I pronounce this correctly, Delafery v. City of Chicago, where the plaintiff, let's see, where the court said that if a plaintiff is, let me see if I can find the particular language. The argument there was also that the plaintiff had not developed her non-economic loss damages and her emotional distress. There was much more in that case than there was here. You have to concede that. There was corroboration from other witnesses. There was more from the plaintiff in that case than there was here in terms of testimony about the non-economic loss. We do have an obligation to maintain some proportionality in these non-economic awards. Yes, I know. And the award there that this court affirmed was $175,000, so we're not asking for that. The principle that the court stated was that brevity and self-control need not be interpreted as a weak case. And I'd also like to point out that many of the cases that are cited by the defendant are quite old, and we've cited authority saying that the court has to take that into account. Sure, that's fair. And so looking at all of these cases and looking at the statement in the 2011 case of Shandlemeyer, Shandlemeyer-Bartels, the court approved there a $30,000 compensatory damage award, but also discussed that a range could go up to $80,000, and that would be reasonable for this type of case where there's not evidence from treaters or anything like that. And in Shandlemeyer, the plaintiff found another job in 10 days. If the compensatory non-economic award is reduced, do the punitives hold up on a proportionality basis? I have not thought about that question, Your Honor. I don't see why they wouldn't. I mean, the jury made its determination separately, I think. Well, there is a proportionality factor that the law takes account of. The punitives can't be disproportionate to the compensatories. And is that judgment made based on the jury's non-economic award or as remitted by the court or also based on a back pay equitable award? I also don't know the answer to that, Your Honor. But I would think that logically the amount of that equitable award should factor in if we were doing a proportionality analysis. Obviously here, where the ratio is 5 to 1, we're not in any danger of getting out of proportion. Right. My question had to do with a potential further remitter from the $50,000 to something more in line with what the cases suggest is appropriate in this situation. Well, the equitable relief is approximately $75,000. It's a 74 and change. And so if we had the same ratio. What do you think accounts for the jury's awarding of punitive damages greater than what you requested? I can't read the mind of the jurors. I think they were. Well, right. There had to be something impressionistic going on in the courtroom that explains it. I don't know. I can speculate that they were offended that Mr. Fair had lied to them. Was he a bad witness? Was he a bad witness? He's sitting in the back of the courtroom, Your Honor. He was very supercilious, I think would be a good word. Okay. There's always something going on in the courtroom that we can't see. And we don't know. And the rules of district court prevent us from debriefing the jurors. So it's just a question out of curiosity. Thank you. Thank you. I hope that was an adequate answer. And we'll let you out this way. Thank you. One other thing I'd like to say about damages, and this is also a quote from the Avisia versus Metropolitan Club. I think Mr. Fawes and I pronounce it differently, but I think we're talking about the same case. But this court said there, commenting on the fact that in that case, as in this case, the defendant made no argument to the jury about damages, made no suggestion about what appropriate amount of damages might be. And this court said, When a defendant goes for broke, staking its all on convincing the jury to award zero damages, it risks being hit with a verdict much larger than if it had offered the jury an alternative estimate of damages to the plaintiffs. It should not expect the appellate court to relieve it from the consequences of its gambling. And that, I think, is very apt in this case cited by a defendant. Unless the court has any other questions, we would ask that the judgment be affirmed. Thank you, Ms. Coyne. Thank you. Three? Three minutes, Mr. Fawes. Thank you, Your Honor. So what would a fair non-economic award be in this case? Your Honor, as to the compensatory damages, I think Avisia is very instructive. $10,500 was awarded in that case in which it's 20 years ago, but cited by this court just five years ago in the Marion County decision as a justification for reducing an award. I would say, but let's take into account inflation, for example. It's not on the record, but the court could take judicial notice of the Department of Labor statistics. The difference between then and now on that $10,500 award, it would be a $16,000 verdict in dollars from 20 years ago. But in that case, again, I remind the court that Mr. Avidia testified to the fact that he was having ongoing problems years later. That does not exist in this case. The other issue I want to touch upon, Your Honors, is this question of whether the third argument on appeal has been preserved. It is absolutely preserved. This court's decision in Fausting, I believe is how it's pronounced, is very clear. The only thing that need be raised in a new trial motion in order to preserve it for appellate review is a challenge to the sufficiency of the evidence. The challenge to the juror, there was an objection. The challenge to the exclusion of the witness, there was motion in limine. You're right. Thank you. Your Honor also referenced, the counsel referenced the Delorey case and Tullis. Your Honor touched on the Delorey case in terms of having far more. The Tullis case was also addressed in our reply brief. That case was referenced in the Chandelmere case. In Tullis, there was an $80,000 compensatory damages award. The testimony was that the plaintiff experienced financial difficulties, couldn't pay utility bills, had to borrow money from family and friends, fell behind on child support payments, and couldn't buy new clothes for his children. A compensatory award of $80,000 was permitted in that case. None of those facts exist here. Plaintiff lived rent-free, caring for her nephew, and she had two lines of text. This court in Ovidia criticized 14 lines of text as being too little. Here you have two lines. I see my time is up. I thank the court for its time. Thank you, fellas. Thanks to both counsel. The case is taken under advisement.